UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

2004 AUG 16  P 12: 53

U.S. DISTRICT COURT
DISTRICT OF MASS

CIVIL ACTION
DOCKET NUMBER:

|  |  |
|---|---|
| **CONSTANTINE M. LOTSMAN** | ) |
| Plaintiff | ) |
|  | ) |
| **v.** | ) |
|  | ) |
| **TRUSTEES OF BOSTON COLLEGE CORPORATION** | ) |
| **FATHER WILLIAM LEAHY,** President of Boston College | ) |
| **ARCHDIOCESE OF BOSTON** | ) |
| Defendants | ) |

## COMPLAINT

**CONTACT INFORMATION:**
**1. Plaintiff**
Constantine M. Lotsman
955 Massachusetts Avenue, PMB 112, Cambridge MA 02139
Phone/Fax: 617.507.3469, Email: clotsman@hotmail.com

**2. Defendants:**
Father Bill Leahy, President of Boston College
Office of the President, Trustees of Boston College Corporation
140 Commonwealth Avenue, Chestnut Hill, MA 02467

Shelley Conley, Director of Admissions
Robber Taggart, Assistant Dean
Carroll School of Management, Boston College, Fulton Hall
140 Commonwealth Avenue, Chestnut Hill, MA 02467-3808
Tel: 617.552.3920, Fax: 617.552.8078, E-mail: mbaappl@bc.ed

Archdiocese of Boston
Most Rev. Sean P. O'Malley, President
2121 Commonwealth Ave., Boston, MA, 02135-3193
Telephone 617-254-0100, FAX 617-783-4564

**Attorney for Boston College:**
Kathleen B. Rogers, Yurko & Perry, PC
Sears Crescent Building, 100 City Hall Plaza, 5th Floor
Boston, MA 02108-2105
Tel: 617.723.6900, Fax: 617.723.6905, E-mail: y&p@bizlit.com

**TABLE OF CONTENTS:**
**1. INTRODUCTION**
**2. JURISDICTION**
**3. PARTIES**
**4. FACTS**
    Basis for Complaint: Events of August 22, 2001
    Facts: Admission Statistics
    Facts: Selectivity Table
    Facts: Demographics of Comparative Student Bodies
    Facts: Redistribution of Funds from Non-Catholics to Catholics
    Facts: Annual Federal Assistance received by Boston College
    Father Leahy v. Founding Fathers: Quotes and Principles
**5. FEDERAL QUESTIONS**
    Count 1. 31 USC Sections 3729-3730 (Civil Actions for False Claims/Qui Tam)
    Count 2. Title VI of the Civil Rights Act of 1964
    Count 3. 18 USC Section 241 (Conspiracy against Rights)
    Count 4. 18. USC Section 245 (Federally Protected Activities)
    Count 5. 18 USC Section 371 (Conspiracy to Defraud the United States)
    Count 6. 18 USC Section 641 (Public Money, Property or Records)
    Count 7. 18 USC Section 1031 (Major Fraud against the United States)
**6. CONCLUSION AND DEMAND**
**7. EXHIBITS**
    Exhibit 1: Quotes of Father Bill Leahy

## I. INTRODUCTION

1. Federally financed Boston College, closely affiliated with Boston Archdiocese unlawfully denies admission to qualified Non-Catholic applicants in violation of 1st Amendment (Freedom of Religion, Separation of Church and State), 14th Amendment (Equal Protection), and other Federal statues.

## II. JURISDICTION

2. The Court has Jurisdiction over this matter pursuant to 28 USC 1331, where jurisdiction arises under the US Constitution, an amendment to the Constitution, an act of US Congress or a treaty of the United States. (The statute of limitations for civil action runs out on August 22, 2004).

## III. PARTIES

3. The Plaintiff Constantine M. Lotsman is a resident of Boston, Mass, Suffolk County. Plaintiff's mailing address is as follows: 955 Massachusetts Ave., PMB 112, Cambridge MA 02139; Phone/Fax: 617-507-3469, E-mail: clotsman@hotmail.com. The Plaintiff is a taxpayer of the United States and of the Commonwealth of Massachusetts.

4. Boston College is a recipient of Federal Contracts and Grants. The College was founded in 1863. According to Boston College website, "it is one of the oldest Jesuit, Catholic universities in the United States...The Jesuit Community at Boston College is committed to maintaining and strengthening the Jesuit, Catholic mission of the University, especially its commitment to integrating intellectual, personal, ethical, and religious formation; and to uniting high academic achievement with service to others... Jesuits are active in all aspects of University life. Some 45

3

teach undergraduate and graduate courses, and another 13 have administrative appointments. This year, 10 visiting scholars and 25 graduate students from 10 countries are Jesuits. Members of the community offer Ignatian retreats, extracurricular programs, and spiritual direction to faculty, staff, and students... Gifts from the Jesuit community have helped establish the Jesuit Institute and the Center for Ignatian Spirituality at Boston College..." "The Institute sponsors personal research, academic exchange, and collective inquiry about the issues that emerge at the intersection of faith and culture. The Center helps members of the University community to understand and implement Jesuit/Ignatian traditions and promotes conversation among other religious traditions represented at Boston College..."

5. Father William P. Leahy of the Wisconsin Province of the Society of Jesus became the 25th President of Boston College in July 1996. Fr. Leahy holds a Ph.D. in history from Stanford University and a master's degree in divinity and sacred theology from the Jesuit School of Theology in Berkeley, California. Father Leahy is the author of *Adapting to America: Catholics, Jesuits and Higher Education in the Twentieth Century*. He currently serves as a President and trustee of Boston College, and is a member of the executive committee of the Association of Jesuit Colleges and Universities. "

## IV. FACTS

6. On August 22nd, 2001 federally-financed Boston College, closely affiliated with Boston Archdiocese, knowingly and willfully denied Plaintiff's application to Graduate Program on the basis of Plaintiff's origin, namely that Plaintiff is not an Irish Catholic. The denial of application on the basis of origin is a reckless violation of Plaintiff's constitutional rights under 1st Amendment and 14th Amendment.

4

7. Present system of federal financing of Boston College constitutes an unconstitutional subsidy to Roman Catholic Church and unlawful redistribution of wealth from non-Catholics to Catholics. Boston College receives more than $500 million in Federal Funds annually, 80% of which comes from Non-Catholic American taxpayers. However, more than 70% of students at Boston College are Catholics.

8. Since Boston College unlawfully favors applications from Catholic (or Irish Catholic) candidates, the basic fairness demands that Boston College should receive funding from the Catholic/Irish Catholic community or from the Catholic/Irish Catholic taxpayers.

9. However, if the Defendants want to continue their financing by the Federal Government, the College should have the student body proportionate to the demographic and religious composition of federal taxpayers who provide their hard-earned dollars.

10. By channeling federal financial assistance to predominantly Catholic students the Defendants not only violate the principle of Separation of Church and State, but also assume the roles of the United States Congress, US Secretary of the Treasury and of US Secretary of Education.

11. The Table below provides evidence about unconstitutional admissions practices and unlawful discrimination of the applicant on the basis of their origin. The first column describes admissions requirements, second column provides data on average performance of accepted applicant (Fall 2001 Enrollment), and third column provides information on Plaintiff's performance as an applicant to the Part-Time MBA Program.

5

**Facts: Admission Statistics**
**Boston College Part-Time MBA Program (Fall 2001)**

| Admission Requirements | Average of Accepted Applicants | Plaintiff |
|---|---|---|
| **GMAT score** | 594 | 610 |
| **TOEFL score** | 615 | 650 |
| **Undergraduate GPA** | 3.16 | 3.4 |
| **Work Experience** (years) | 5 | 9 |
| **Work Experience** (As Evaluated by BC Officer on the Vote-Sheet) | ? | "Good work experience" |
| **Recommendation 1** SR (Strongly Recommend) R (Recommend) RR (R. With Reservations) DNT (Do Not Recommend) | ? | SR (Strongly Recommend) |
| **Recommendation 2** SR (Strongly Recommend) R (Recommend) RR (R. With Reservations) DNT (Do Not Recommend) | ? | SR (Strongly Recommend) |
| **Grade by BC Officer for Recommendation 1** (A, B, C, D) | ? | B |
| **Grade by BC Officer for Recommendation 2** (A, B, C, D) | ? | B |
| **Essays 1, 2, 3** | N/A | N/A (BA degree in Journalism) |
| **Essays** (As evaluated by BC Officer on the Vote-Sheet) | ? | "Has done research about his business mentioned in Essay #1; seems very serious about it." |
| **Origin** | Catholics/Irish Catholics (At least 70% of accepted) | Non-Catholic |
| **Admissions Decision:** • Accept • Waitlist • Deny • Interview • Accept with English • Defer to Committee | ACCEPT (59 applicants were waitlisted) | DENY |

6

12. The question may arise how admission officers determine which applicant is Catholic or Irish Catholic. It's simple: the applicants with Catholic/Irish Catholic surnames are most likely Catholics; applicants from Catholic regions or countries are most likely Catholics; applicants who graduated from Catholic high schools and Catholic colleges are most likely Catholics. Besides, many applicants directly indicate in their essays that they decided to apply to BC because the college is Catholic, or they directly state that they are proud to be Irish Catholic, which makes admission officers sympathetic to their applications.

13. In order to facilitate denial of Plaintiff's application, the Defendants engaged in reckless violation of their own rules of admissions. BC Application states the following: "MBA and MSF applicants are required to take the GMAT... Only GMAT scores from January 1996 through April 2001 (July 2001 for evening MBA or MSF applicants) are valid".

14. Contrary to above-mentioned rules of admissions, on July 8th, 2001 (Sunday) the Boston College sent the following e-mail to the Plaintiff: "Dear Constantine: Thank you for submitting your application for admission to the September 2001 Evening MBA Program. Upon initial review of your application it was noted that your 10/91 [*October 1991*] GMAT Score Report has not yet been received by the MBA Admissions office. Please note, only complete applications will be forwarded to the MBA Admissions Committee for their review and evaluation... Thank you, MBA Admissions, Boston College, mbaappl@bc.edu". Requesting 1991 GMAT Score Report is a reckless violation of admission procedure.

15. The table below shows selectivity for Part-Time MBA Program (Fall 2001 Enrollment).

**Facts: Selectivity Table**

**Boston College Part-Time MBA Program (Fall 2001)**

|  | Number of Applicants | Number of Accepted Applicants | Selectivity (Column 3 divided by Column 2) |
|---|---|---|---|
| **Underrepresented Minority Applicants** | 11 | 1 | 9% |
| **International Applicants** | 60 | 1-2 | 2%-4% |
| **All Applicants** | 374 | 142 | 38% |

16. It may be added that total number of Part-Time MBA students in 2001 was 534 (as of September 2001). Out of 534 students less than 6 students (1%) were members of underrepresented minorities and less than 6 students (1%) were international students.

17. The next table facilitates understanding of how student body at BC differs from student bodies at other colleges and universities, including schools in the same geographical region.

**Facts: Demographics of Comparative Student Bodies**

**Part-Time MBA Programs**

| Name & location of Business School | Underrepresented Minority Students | International Students |
|---|---|---|
| Boston College<br>Boston, MA | 1% | 1% |
| Boston University<br>Boston, MA | 6% | 10% |
| Simmons College<br>Boston, MA | 15% | 30% |
| Northwestern/Kellogg<br>Illinois | 18% | 13% |
| Keller<br>Illinois | 43% | 4% |
| Texas A & M<br>Corpus Christi, Texas | 28% | 5% |
| USC/Marshall<br>Los Angeles, CA | 10% | 14% |

18. As mentioned above, the present system of federal financing of Boston College constitutes an unconstitutional subsidy to Roman Catholic Church and unlawful redistribution of wealth from non-Catholics to Catholics/Irish Catholics as follows:

**Facts: Redistribution of Wealth from**

**Non-Catholic Taxpayers to Catholics/Irish Catholics**

|  | Composition of US Taxpayers | Composition of student body at Boston College |
|---|---|---|
| Catholics | 20% | more than 70% |
| Non-Catholics | 80% | less than  30% |

19. It may be useful to keep in mind that in the Commonwealth of Massachusetts 1/3 of residents (2 millions) is Catholic while 2/3 is Non-Catholic.

20. Boston College is a recipient of Federal Contracts, Grants, and Loans. The College receives

more than $500 million in Federal Funds annually as shown in this table:

### Facts: Annual Federal Financial Assistance received by BC.

| BC endowment | Annual Federal Assistance (US Taxpayer's Funds) | Total Federal Assistance received since 1967 |
|---|---|---|
| $1bln | $0.5bln | $18.5bln |

21. All unconstitutional practices mentioned in this Complaint took place under the leadership of

Father William Leahy, whose beliefs are not consistent with fundamental believes of American

Founding Fathers as shown in two tables below:

### Father Leahy v. Founding Fathers: Quotes

| Founding Fathers: Quotes | Father Leahy: Quotes |
|---|---|
| "We hold these truths to be self-evident, that all men are created equal, that they are endowed by their Creator with certain unalienable Rights, that among these are Life, Liberty and the pursuit of Happiness"<br>Thomas Jefferson | "So much of the grace and freedom... has come to me through my fellow Jesuits... I have never met a finer group of men."<br>Father Leahy |
| "Educate and inform the whole mass of the people... They are the only sure reliance for preservation of our liberty."<br>Thomas Jefferson | "Most Catholic colleges and universities... have a solid core of administrators and faculty who are sympathetic with Catholicism and who greatly want to enhance the Catholic character of their schools."<br>Father Leahy |

Father Leahy v. Founding Fathers: Principles

22.

| Founding Fathers: Principles | Father Leahy: Principles |
|---|---|
| Separation of Church and State | Federal subsidies to Catholic Colleges |
| Freedom of Religion | Favoritism of Catholic applicants |
| Allegiance to the Constitution | Allegiance to the Vatican |
| All men are created equal | All men are created equal, but Catholics are more equal than Non-Catholics |

23. More detailed views and quotes of Father William Leahy, President of Boston College, can be found in Exhibit 1.


## V. FEDERAL QUESTIONS

### Count 1

### 31 USC Sections 3729 & 3730 (Civil Actions for False Claims)


24. The Boston College is a recipient of Federal Contracts, Grants, and Loans. The website of Boston College states the following: "As a recipient of federal contracts and grants, the University certifies to all funding agencies ..." Copyright, 2004, Trustees of Boston College.


25. The False Claims Act imposes civil liability on any entity who submits a false claim for payment to the United States government. The False Claims Act also prohibits:


- Making a false record or statement to get a false claim paid by the Government

- Conspiring to have a false claim paid by the Government
- Making a false statement to avoid or deceive an obligation to pay money to the Government.

26. Under Section 3729 the 'Claim' is defined as following: "For purposes of this section, 'claim' includes any request or demand, whether under a contract or otherwise, for money or property which is made to a contractor, grantee, or other recipient, if the United States Government provides any portion of the money or property which is requested or demanded, or if the Government will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded." Under this section Boston College is a grantee, contractor as well as 'other recipient'.

27. Every year the Boston College bills the United States Government for approximately $500 millions. These funds are supposed to be used for educating qualified students accepted to BC on the basis of their merit and promise. These funds are not supposed to be used for educating students admitted on the basis of their religious or ethnic origin.

28. Significant portion of federal funds come to BC as loans. In an ideal world all of these loans are supposed to be repaid. However, in the real world it's not the case. Not all student loans are fully repaid. By selecting applicants on the basis of their religious and ethnic origin (rather than on the basis of merit and promise) the Boston College decreases amount of loans repaid to the Government, because under-qualified students have greater risk of defaulting on their loans. In other words, the admission practice of Boston College is a gamble with public money.

## Count 2

### Title VI of the Civil Rights Act of 1964

29. Title VI of the Civil Rights Act of 1964 prohibits discrimination based on race, color, or national origin in programs or activities receiving federal financial assistance. Most private colleges and universities, including Boston College, receive such assistance. However, there are some private colleges that do not receive any financial assistance, and Title VI does not apply to them.

30. Although Title VI does not cover discrimination based on religion, this Count still applies to the Complaint, because Boston College unlawfully gives preference to those applicants who are not just Catholics, but predominantly Irish Catholics, which constitutes direct violation of Title VI on the basis of national and/or ethnic origin.

## Count 3

### 18 USC Section 241 (Conspiracy against Rights)

31. Section 241 prohibits conspiring against constitutional rights of individuals: "If two or more persons conspire to injure, oppress, threaten, or intimidate any person in any State, Territory, Commonwealth, Possession, or District in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States, or because of his having so exercised the same... they shall be fined under this title or imprisoned not more than ten years, or both..."

## Count 4

### 18. USC Section 245 (Federally Protected Activities)

32. Section 245 prohibits interfering in programs receiving Federal Aid as follows: "Whoever, whether or not acting under color of law, by force or threat of force willfully injures, intimidates or interferes with, or attempts to injure, intimidate or interfere with…participating in or enjoying the benefits of any program or activity receiving Federal financial assistance…"

## Count 5

### 18 USC Section 371 (Conspiracy to Defraud the United States)

33. The selection of Catholics/Irish Catholics for admissions and Federal Aid costs hard-working American taxpayers $0.5 billions annually. Most taxpayer's funds come from hard-earned dollars of Non-Catholic families (80% of Americans are not Catholics). These families have much better use for their hard-earned dollars, including education of their own children, supported by federal funding.

34. Section 371 states the following: "If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined under this title or imprisoned not more than five years, or both. If, however, the offense, the commission of which is the object of the conspiracy, is a misdemeanor only, the punishment for such conspiracy shall not exceed the maximum punishment provided for such misdemeanor"

## Count 6

### 18 USC Section 641 (Public money, property or records)

35. Section 641 prohibits converting public money to one's use or to the use of another as follows: "Whoever embezzles, steals, purloins, or knowingly converts to his use or the use of another, or without authority, sells, conveys or disposes of any record, voucher, money, or thing of value of the United States or of any department or agency thereof, or any property made or being made under contract for the United States or any department or agency thereof…"

## Count 7

### 18 USC Section 1031 (Major fraud against the United States)

36. "Whoever knowingly executes, or attempts to execute, any scheme or artifice with the intent to defraud the United States… to obtain money or property by means of false or fraudulent pretenses, representations, or promises… be fined not more than $1,000,000…The maximum fine imposed upon a defendant for a prosecution including a prosecution with multiple counts under this section shall not exceed $10,000,000…"

## VI. CONCLUSION AND DEMAND

37. In 1802 Thomas Jefferson wrote a letter to the Danbury Baptist Association. This document is often quoted to emphasize the importance of separation of church and state. Below is a full text of this letter, which may or may not be appreciated by the Defendants:

38. "To Messrs. Nehemiah Dodge and Others, a Committee of the Danbury Baptist Association, in the State of Connecticut.

15

January 1, 1802.

Gentlemen, — The affectionate sentiments of esteem and approbation which you are so good as to express towards me, on behalf of the Danbury Baptist Association, give me the highest satisfaction. My duties dictate a faithful and zealous pursuit of the interests of my constituents, and in proportion as they are persuaded of my fidelity to those duties, the discharge of them becomes more and more pleasing.

39. Believing with you that religion is a matter which lies solely between man and his God, that he owes account to none other for his faith or his worship, that the legislative powers of government reach actions only, and not opinions, I contemplate with sovereign reverence that act of the whole American people which declared that their legislature should "make no law respecting an establishment of religion, or prohibiting the free exercise thereof," thus building a wall of separation between church and State. Adhering to this expression of the supreme will of the nation in behalf of the rights of conscience, I shall see with sincere satisfaction the progress of those sentiments which tend to restore to man all his natural rights, convinced he has no natural right in opposition to his social duties.

40. I reciprocate your kind prayers for the protection and blessing of the common Father and Creator of man, and tender you for yourselves and your religious association, assurances of my high respect and esteem.

Thomas Jefferson"

41. Source of the quote: Letter to the Danbury Baptist Association, January 1, 1802; from Merrill D. Peterson, ed., Thomas Jefferson: Writings, New York: Library of America, 1994, p. 510.

## DEMAND

42. WHEREFORE, the Plaintiff demands judgment against the Defendants for damages and such other relief as this Honorable Court deems just, including compensatory damages, punitive damages, emotional distress and other damages as determined by this Honorable Court.

43. The Plaintiff requests Trial by Jury.

Constantine M. Lotsman

Plaintiff

United States Taxpayer

955 Massachusetts Avenue, PMB 112

Cambridge MA 02139

Phone/Fax: 617.507.3469

E-mail: clotsman@hotmail.com

# EXHIBIT 1

### Quotes of Father William Leahy,
### President of Boston College

(Source: William Leahy. "Adapting to America. Catholics, Jesuits, and Higher Education in the Twentieth Century")

| Quote | Page Number |
|---|---|
| Most Catholic Colleges and Universities also have the benefit of trustees and at least a solid core of administrators and faculty who are sympathetic with Catholicism and who greatly want to enhance the Catholic character of their schools. | 156 |
| to continue serving and affecting modern society in the twenty-first century, Catholic colleges and universities must confront two crucial challenges. First, they need to devise ways of attracting and retaining personnel committed to the religious and academic goals of Catholic education. | 156 |
| Catholic colleges and universities have developed programs to raise funds from government | 155 |
| In addition to academic knowledge, Catholic postsecondary institutions seek to transmit Catholic traditions, values, and principles, hoping to influence their students and the wider community. | 143 |
| Studies of faculties in American institutions of higher learning have noted that scholarly production and religious commitment vary inversely and that "stronger degrees of one tend to be accompanied by weaker degrees of the other." | 143 |
| As Steinberg cautions, his findings do not indicate that religious beliefs preclude scholarly achievement. But they do suggest that commitments to religion inhibit scholarship and academic excellence. Considered with other evidence, they help explain the failure of Catholic higher education to make greater advances toward quality and status after 1945. | 144 |
| A 1964 survey of attitudes among a representative group of male faculty in Catholic colleges and universities (267 professors from twenty-two institutions) reported that 80% preferred teaching but only 12.4% chose research; and 75% of the sample had little or no record of publication | 142 |

1

| | |
|---|---|
| Edward Rooney, S.J. told his superior general in 1955, 'There is evidence that enemies of Catholic thought are striving to organize more and more state and even private and even resources to establish secular institutions on such a plane that they will dwarf Catholic educational institutions" | 141 |
| Catholic higher education also failed to make greater academic progress in the postwar decades because its leaders and faculty often subordinated intellectual achievement to personal and institutional religious commitments. Such choices retarded development of quality educational programs and dampened interest in scholarship, the main criteria for status in American academic circles | 141 |
| Catholicism failed to develop top-ranked colleges and universities | 137 |
| Various reasons have been offered in the past thirty years for the inferior academic status of Catholic higher education in the United States. In 1955, John Tracy Ellis attributed the problem to the effect of anti-Catholic prejudice... | 136 |
| Speaking in 1966, Paul Reinert, S.J., a veteran administrator in Jesuit higher education, emphasized that "the over-riding problem of Jesuit colleges and universities is the fact that they are under financed." | 136 |
| Recent investigations have spotlighted the low intellectual prestige of Catholic higher education | 135 |
| While many Catholic colleges and universities offer at least an adequate undergraduate education, few possess national reputations for academic excellence, and none ranks among elite institutions in graduate programs, research, and professional scholarship. | 135 |
| Of the one hundred Catholics in the U.S. House of Representatives in 1973-1974, 40% attended Catholic colleges and universities; 20% of them received all of their higher education in Catholic schools. | 134 |
| The availability of federal aid and the willingness of Catholic schools to accept it permitted Catholic higher education to expand dramatically and to move toward its goals of serving Catholics and increasing Catholic influence in American society. | 134 |
| Catholic schools obtained millions of dollars from the federal government to build residence halls, laboratories, cafeterias, and classroom buildings. | 134 |

2

| | |
|---|---|
| An advisor to the provincial of the Missouri Province of the Jesuit order reported to his Roman superiors in 1964 that "the University [St. Louis] will not be able in the future to maintain all of its operations unless there are more and more subsidies from the Federal Government." | 134 |
| During 1967 alone, Catholic higher education received $125,000,000 in federal grants and contracts, not counting repayable loans. | 134 |
| After 1945 a growing number of Catholic leaders aggressively sought financial aid from the Government, fully aware that the Catholic community alone could not finance the increasing social, educational, and religious expectations placed on Catholic schools. When the Truman Commission recommended in 1948 that the federal government confine its assistance to publicly controlled institutions of higher learning, Catholic officials and certain others from private institutions objected strenuously. They argued that service to the public rather than public control should be the criterion for aid. | 133 |
| Various Catholic leaders favored federal aid to education, provided it did not entail federal control. | 133 |
| Educational expansion also offered the possibility of communicating Catholic ideas more widely, thus extending Catholic influence in society. Fostering a social, political, and intellectual environment guided by Catholic teachings and moral values had always been an integral part of the Catholic educational commitment. | 132 |
| Nearly 4,000 Catholics attended Columbia University in 1964, approximately 25% of the total enrollment; and by 1970, Catholics constituted 18% of the freshman class at Princeton, compared with 7% in the mid-1920s. | 128 |
| A second factor in postwar Catholic educational expansion resulted from concerns about protecting Catholic faith and culture. | 128 |
| The percentage of Catholics in 17-25 age group enrolled in college rose from 19% during the 1930s to 45% in the 1960s, 2% above the national average. By the time of the Vietnam War, 59% of college-age Irish Catholics attended postsecondary institutions, a higher rate than any Gentile group in American culture except Scandinavian Protestants, with whom they were tied. The educational levels of German, Polish, and Italian Catholics during the late 1960s also exceeded the national norm, while Catholics of Slavic origin fell only 1% below it. | 127 |
| By the late 1960s, all levels of Catholic education clearly suffered from a crisis in | 125 |

3

| | |
|---|---|
| purpose as well as from severe financial problems. | |
| The election of John Kennedy as the first Catholic president of the United States confirmed the arrival of Catholics in American politics and society. By 1977, one-third of state governors belonged to the Catholic Church. | 124 |
| A study of the 101st Congress elected in November 1988 showed that 120 representatives and 19 senators were members of the Catholic Church, giving Catholics more seats in the national Government that warranted by their percentage of the American population. | 124 |
| According to national polls conducted by the University of Michigan Survey Research Center in 1957, 81% of Catholic men and 88% of Catholic women surveyed reported that they attended church regularly or often, compared with 53% of Protestant males and 69% of Protestant females. The vast majority of Catholics adhered to such religious practices as abstaining from meat on Fridays, and they accepted the spiritual authority of the pope and other clerical leaders. | 124 |
| Before 1945, American Catholics lagged well behind Jews and most Protestants denominations in social and economic standing. While aligning themselves with Roosevelt and the Democratic Party in the 1939s had improved the image and political status of Catholics, members of the Catholic Church still remained politically underrepresented in the early 1940s. In 1943, Catholics held only 13% of the seats in Congress (59 in the House and 10 in the Senate), though they made up approximately one-quarter of the American population. | 123 |
| Robert Hutchins criticized Catholic schools for failing to uphold the Catholic intellectual heritage. He told a meeting of Midwestern Catholic educators in 1937 that "Catholic education is not Catholic enough." | 55 |
| To become academically respectable, Catholic colleges and universities after World War I needed leaders with vision, flexibility, intellectual sensitivities, and an awareness of contemporary secular thought. Catholics traditionally expected such leadership from their priests and bishops. | 46 |
| Though it was discouraged, hiring non-Catholics was sometimes the only option. William Magee, S.J., president of Marquette, represented the views of many administrators when he told his provincial in 1929 that "While it is certainly highly desirable to have only Catholic deans, at the present time this is impossible." | 46 |
| Furthermore, "I [Ledochowski] do now positively ordain that in the future no one who is not a Catholic must under any circumstances be given the office of dean, and I | |

| | |
|---|---|
| desire that wherever it can be prudently done, present non-Catholic deans be replaced by Catholics." | 44 |
| According to information sent to Rome, these schools could "in no sense of the word be called Catholic Universities"; …The professors in Jesuit institutions of higher education were mostly Protestants, Jews, or even atheists… | 43 |
| Bigotry also slowed accommodation of Catholics to American culture. | 43 |
| Penal laws enacted after the Protestant Reformation restricted Catholic access to schools in Ireland and England, stunting Catholic intellectual life in these two countries for decades… Furthermore, most Catholic immigrants grew up in peasant societies, which did not communicate habits and attitudes fostering intellectual activity. Their environments stressed tradition, family ties, and acceptance of authority, orientations which often conflicted with the independence, critical thinking, and curiosity necessary for sustained intellectual activity. | 42 |
| Along with other Catholic officials, certain Jesuits argued that Newman clubs could not substitute for the religious atmosphere of Catholic higher education and suggested that choosing non-Catholic colleges and universities conflicted with the educational ideals and canon law of the Catholic Church. | 41 |
| …the presence of Catholics in non-Catholic higher education was "not at all desirable but at most in certain circumstances tolerated." | 41 |
| Eager for more students but also motivated by concerns about dangers to the faith of Catholics attending non-Catholic institutions, Catholic leaders in the early 1920s began publicizing the merits of Catholic schools. | 41 |
| Other Jesuits shared the desires of the IPCS to update Jesuit higher education without sacrificing its core values and to inject Catholic ideas into American culture. | 39 |
| Growing secularism and anti-Catholicism in American society reinforced Catholic insularity. | 37 |
| A committee of Jesuit educators warned the following year that "We are daily witnessing the alarming development of an increasingly dangerous and hostile attitude throughout this country toward denominational education in general and toward Catholic education in particular…" | 37 |

5



| | |
|---|---|
| Edward Tivnan, S.J., president of Fordham between 1919 and 1924, noted in 1931 that students in Jesuit schools "have reputation for lack of initiative when they graduate and go to other schools. They have not been trained to face problems squarely and to think for themselves... They have been trained to depend too much on memory and too little on independent thought." | 36 |
| As a representative of the Jesuit superior general declared while visiting the United States in 1921, "the primary end of our [Jesuit] colleges is to impart religious instruction in the most effective manner and to imbue the minds of boys and young men with solid and manly piety." Such a priority often resulted in schools giving inadequate attention to the development of critical thinking, research, and intellectual excellence. | 34 |
| Catholic postsecondary institutions lacking accreditation could not effectively communicate Catholic values and ideas in American society, a long-standing goal of Catholic education in the United States. | 33 |
| St. Louis University reportedly vetoed membership in the North Central Association early in the twentieth century because it feared that the organization was contaminated by money from the Carnegie Foundation, regarded by many Catholic educators as an agent of secularization. | 25 |
| Jesuit provincial superiors at a meeting in 1918 described secular universities as places "where doctrines contrary to the Faith and teaching of the Church are disseminated." | 24 |
| They [Catholic educators] particularly objected to Carnegie Foundation policies which restricted grants to nonsectarian higher educational institutions and thus tempted schools to abandon religious ties for money. | 24 |
| Pope Pius X issued an encyclical in 1905 urging that religious instruction be provided for Catholic students in public institutions. | 23 |
| The Carnegie Foundation before World War I specifically excluded church-related schools from receiving grants, holding that such institutions by definition put limits on intellectual freedom and could not meet the test of a true college or university. | 16 |
| White specifically denied that "any great university fully worthy of that great name can ever be founded upon the platform of any one sect or combination of sects." | 16 |
| Catholics and their educational institutions struggled for decades after the 1840s | |

| | |
|---|---|
| against conditions greatly affected by heavy European immigration and Protestant bias. | 13 |
| The rapid growth of compulsory public education, which was officially nonsectarian but actually Protestant-oriented, alarmed them [Catholics]. | 11 |
| Between 1790 and 1960, men of Irish birth or descent made up almost 75% of those chosen to be bishops. | 10 |
| The denial of government aid to parochial schools in the 1870s and founding of the anti-Catholic American Protective Association in 1887 confirmed for them that Catholics were not accepted in America. | 10 |
| The combination of numerical growth and religious prejudice also generated ideological problems for Catholics in the United States concerning their relationship to society. | 8 |
| The intellectual climate in America, at best aloof and generally unfriendly to Catholic thought, further retarded the development of Catholic academic culture. | 7 |
| Seemingly, desires for material possessions and wealth, not schooling and intellectual development, prevailed as the controlling motivation for many in the Catholic Church. | 6 |
| In the decade prior to World War I, 7% of American Catholics in the 17-25 bracket attended college, while the national average was 17%. | 6 |
| Though over 15% of the population in 1925, they [Catholics] held only 4% of federal judgeships...Furthermore, in 1930 not a single state Governor belonged to the Catholic Church. | 5 |
| Protestant hegemony manifested itself in various ways. According to a 1949 study, a mere 7% of leading American businessmen active between 1900 and 1910 were Catholics. | 4 |
| With less than half the Catholic population, Methodists had three times the Catholic representation in Congress; and Episcopalians outnumbered Catholics in both Houses five to one, despite having about one-fifteenth the membership of the Catholic Church. | 5 |
| The fears and hostility of Protestants, which occasionally flared into violence, fostered | |

| | |
|---|---|
| intense anti-Catholic feelings that became deeply ingrained into American consciousness. | 3 |
| At least 33 Catholics studied at Harvard in 1881, 300 in 1894, nearly 400 (about 12% of the total enrollment) in 1904, and 480 in 1907; and by the mid-1920s, about 7% of first-year students at Princeton belonged to the Catholic Church. | 3 |
| Catholic higher learning currently faces a growing shortage of personnel committed to fostering Catholic spiritual and educational values. Moreover, it lacks a compelling sense of purpose. | Preface |
| The history of Catholic colleges and universities after 1900 is a story not only of dedication, grand dreams, and real successes, but also of poor leadership, narrowness, and missed opportunities. | Preface |